No. 30,025.

JULIA PAULSEN and MARY PICKEL, *Appellants*, v. LOTTIE McCORMACK, *Appellee*.

(1 P. [2d] 159.)

Opinion filed July 3, 1931.

*Clarence Paulsen* and *Clyde L. Short*, both of Concordia, for the appellants.

*E. S. Rice, W. S. Rice, A. W. Relihan* and *T. D. Relihan*, all of Smith Center, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This was an action in ejectment for the possession of a Phillips county farm to which the rival litigants laid claim through alleged rights conferred upon them by the record title holder, who was the mother of plaintiffs and grandmother of defendant.

The facts developed by the pleadings and evidence make a story of human interest to which we will give some space, although counsel for appellee intrudes a motion to dismiss the appeal, which may prevent a full review.

It appears that Herman Gebers and Isabell Gebers, his wife, were thrifty pioneers of Phillips county who accumulated a good deal of property. They had three daughters, Julia, Mary and Anna, all of whom grew to womanhood and married. Herman died testate in 1919, leaving a life interest in his property to Isabell with remainder to the three daughters. Isabell was a competent business woman, and she so successfully managed the life estate devised to her that her income exceeded her requirements. Isabell's daughter Anna married a man named Reese, and the defendant Lottie Reese

McCormack is the issue of that marriage. When Lottie grew to womanhood she married a Mr. McCormack apparently without her parents' approval and they left her and her husband to make their way in the world without parental assistance. That situation aroused the interest of Lottie's grandmother, Isabell Gebers, and the old lady took upon herself the task of putting the young couple on the road to prosperity.

Grandmother Gebers bought a good half section of land near Kirwin, poorly improved, and put Lottie and her husband upon it. She required them to pay the equivalent of the customary rent of the community, but devoted all the proceeds to the improvement of the property, and encouraged Lottie and her husband to improve it as their own. She repeatedly told them and the neighbors that the farm was Lottie's. Indeed, before the old lady bought the farm, Lottie and Isabell had some correspondence in which Lottie had asked her grandmother to lease one of her farms. The grandmother declined, saying that she had a better plan than that; that she would buy a farm for Lottie with her own funds, and then the rest of the family would have nothing to say about it. When Isabell did purchase the farm, in 1922, she wrote to Lottie:

"I have bought you a place; it is near Plato's folks; it is four miles west and one and one-half miles north of Kirwin. The farm land lies pretty good; the pasture is rough, but that does not make much difference; the improvements are poor. I thought it would be better to get better land and less improvements, than nice improvements and poor, rough land, as you can improve the land and you cannot make much of a living off of poor land. I am giving you this place; you can improve it any way you want to. You will get possession next spring."

When the old lady got ready to make her will she sought the services of one of her sons-in-law, P. J. Paulsen, and he so framed the will as to leave it open to the construction that this farm was devised to his own wife and her sister. The language of the will recites:

"Third: I give, devise and bequeath to my daughters, Julia Paulsen, of Concordia, Cloud county, Kansas, and Mary Pickel, of Speed, Phillips county, Kansas, share and share alike, all of my real property located in the state of Kansas."

Isabell died on December 29, 1928, and within due time after the probate of the will this lawsuit followed. The cause was tried before a jury which rendered a general verdict in favor of defendant, and answered certain special questions which read:

"1. Did the defendant or her husband enter upon the land in question as the tenant or tenants of Isabell Gebers?  A.  No.

"2. Did the defendant or her husband after entering upon the land in question become the tenant or tenants of Isabell Gebers?  . . .  A.  No.

"3. If you answer question No. 1 or No. 2 'Yes,' then state which was tenant.  A.——.

"4. Did Isabell Gebers make a gift of the land in question to the defendant?  . .  . A.  Yes.

"5. If you answer 'Yes' to question No. 4, then state whether the gift was made by letter or verbally or both.  A.  Both by letter and verbally.

"6. State fully the terms and conditions of such gift.  A. Defendant was to live upon land and one-third of proceeds go for improvements.

"7. Did the defendant take possession of the land by virtue of said gift and hold the same during the lifetime of said Isabell Gebers?  A.  Yes.

"8. Did the defendant, relying on the gift, make valuable and lasting improvements on the land?  A.  Yes.

"9. If you answer 'Yes' to question No. 8, then state fully what the improvements were.  A.  Cistern, windmill, granary, barn, chicken house, brooder house, planting fruit trees.

"10. Did Isabell Gebers, after defendant or her husband entered upon the land, exercise any control over the land in question?  A.  No.

"11. Did Isabell Gebers, after defendant or her husband entered upon the land, exercise any ownership over the land in question?  A.  No."

The verdict and special findings were returned on September 10, 1930, and on October 7, 1930, which was the court's regular motion day, plaintiffs' motion to set aside the special findings and motion for a new trial were considered and overruled, and the judgment roll then recites:

"It is therefore ordered, adjudged and decreed that the defendant recover the costs of this action taxed against the plaintiffs in the sum of $206.10."

On December 12, 1930, plaintiffs filed their notice of appeal.  Defendant moved to dismiss for the reason that on November 20, 1930, one of the plaintiffs satisfied the judgment by payment of the costs in full, and that the sum thus paid ($191.10—$15 having been deposited in advance) had been distributed by the clerk of the district court of Phillips county as required by law.  This motion is supported by the affidavit of M. N. McIlwain, clerk of the district court. He avers that—

". . . On the 7th day of October, 1930, . . . a judgment was rendered in said case in favor of the defendant and against the plaintiffs and each of them for costs, which amounted to and were taxed at $206.10.

"That a part of the $206.10 was for costs that were incurred for and made by the defendant; that no execution was ever issued upon said judgment, nor was a præcipe ever filed for an execution, and no stay of execution was re-

quested by either party plaintiff and no order for a stay of execution or to supersede said judgment in any manner was ever made.

"That on the 28th day of November, 1930, the judgment was satisfied by the plaintiffs paying into court the amount of said judgment in the sum of $206.10, for which a receipt was given, and that said sum has since been distributed and the proceeds receipted for and the judgment has been thus fully satisfied and paid.

"That on the 12th day of December, 1930, and after the amount of the judgment, to wit, $206.10, was distributed, notice of appeal was filed in this office and a certified copy of the journal entry of judgment, together with said notice of appeal, was forwarded to the clerk of the supreme court of the state of Kansas."

To get out of this dilemma counsel predicate an argument on what they choose to characterize as the involuntary payment of the costs by one of the appellants. But the adjective "involuntary" does not fitly apply. There was no impending levy upon the property of Mary to satisfy the judgment, no execution had been issued, nor præcipe for execution filed. It was simply a case where apparently a final judgment ought to be satisfied, and no record reason then existed why it should not be satisfied.

The industry of counsel for appellants has discovered some textbook doctrine, 2 R. C. L. 65, based on decisions from other jurisdictions which seem to hold that the payment of costs by a defeated litigant does not waive or lose his right of appeal, that even the voluntary payment thereof either before or after taking such appeal is sometimes regarded as no bar to an appellate review. The rule in this jurisdiction, which we think is decidedly more logical, is clearly to the contrary. Indeed, the author of 2 R. C. L. 65 takes note of the fact that the Kansas rule is otherwise and our case of *State v. Conkling,* 54 Kan. 108, 37 Pac. 992, is cited for the footnote. That was a quasi-criminal case, but our rule makes no distinction between criminal and civil cases. Time and again it has been held that anything that savors of acquiescence in a judgment cuts off the right of appellate review, and payment of costs by a defeated litigant falls in that category. In *Bank v. Bracey,* 112 Kan. 617, 212 Pac. 675, our principal earlier cases were reviewed. The syllabus concisely states the whole case as well as the ruling:

"The action was one to recover on a promissory note. The defense was, the note had been procured by false representations, and the plaintiff was not an innocent holder. The defendant prevailed, and judgment was rendered against the plaintiff for costs. The plaintiff appealed, and afterwards paid the costs. *Held,* the appeal must be dismissed." (Syl.)

See, also, *State v. Massa*, 90 Kan. 129, 132 Pac. 1182.

Counsel suggest that some different rule might be developed where one of two defeated plaintiffs was only a nominal party and she paid the judgment for costs while her fellow litigant was determined to appeal. We cannot assent to the idea that either of these plaintiff litigants was only a nominal party. For aught that appears the one who paid the costs was as much concerned in the litigation as the other. If indeed the plaintiffs were not in accord as to the policy of the litigation the one who is now said to have had all the responsibility of it might have made the other a defendant rather than to have made common cause with her as plaintiff in the action. Moreover, it is so very easy in this state to procure a stay of execution, supersedeas, or the like, which would halt an execution for costs, that we are constrained to believe that in those jurisdictions which hold that satisfaction of a judgment for costs does not constitute such an acquiescence in the judgment as to preclude an appeal the facility with which a stay of execution can be obtained in this state does not exist.

The motion to dismiss must therefore be sustained, but the court has not deprived itself of a perusal of the record on that account, and the impression we have thus gathered gives us no misgiving that justice may have miscarried. Indeed, what was said in *Fox v. Eaglin*, 132 Kan. 395, 295 Pac. 662, may aptly be repeated here:

"This was quite a proper lawsuit to be tried in the district court—to be tried there with might and main; but when it was tried and determined in that tribunal, so well equipped to ascertain the truth of disputed issues of fact, the case presented nothing to justify the expense of an appeal."

Dismissed.